[No. AO17092. First Dist., Div. Three. Apr. 13, 1983.]

UNIVERSITY OF SAN FRANCISCO FACULTY ASSOCIATION,
Plaintiff and Appellant, v.
UNIVERSITY OF SAN FRANCISCO, Defendant and Respondent.

**COUNSEL**

Victor J. Van Bourg, Vincent A. Harrington, Jr., and Van Bourg, Allen, Weinberg & Roger for Plaintiff and Appellant.

Littler, Mendelson, Fastiff & Tichy, Garry G. Mathiason and William F. Terheyden for Defendant and Respondent.

**OPINION**

**SIMS, J.***—Petitioner, a faculty association, has appealed from that part of a judgment, entered in proceedings in which it sought confirmation of an arbitration award, denying it relief in respect to one of five points set forth in the award. It contends that the trial court erred in upholding the respondent University of San Francisco's (University) claim that the arbitrator exceeded his authority in making an award relating to the "Supplemental Pension Plan," as he did in the fifth point of his award.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

Admittedly the University of San Francisco Faculty Association (Association) is a labor organization within the meaning of the National Labor Relations Act of 1947 as amended, and has been certified by the National Labor Relations Board as the exclusive bargaining representative of nonlaw faculty members of the University, and the University is an employer within the meaning of that act.[1] It is also admitted that the collective bargaining agreement, a copy of which is attached to the petition, was entered into on August 30, 1977, by the Association and the University, and that on or about June 7, 1979, the parties entered into an additional agreement, a copy of which is also attached to the petition. The University admitted that the award, a copy of which is attached to the petition and which is the subject of this action, was set forth by the arbitrator on November 20, 1981, in advance of a full opinion. It denied, however, the Association's allegations concerning its conclusions concerning the legal effect of the earlier agreements, the manner in which the arbitration was submitted, and the ability and the willingness of the University to comply with the award.

The University affirmatively alleged that it was in the process of implementing the first four points of the arbitrator's award; that the arbitrator had no authority to make an award concerning the "Supplemental Pension Plan" as that matter was merely a permissive subject of bargaining under the National Labor Relations Act; that the arbitrator exceeded his authority in that point of his award; and that the petition failed to state facts sufficient to constitute a cause of action. The University prayed that the court vacate the award, or at least the fifth point contained therein.

The matter was submitted to the superior court on the pleadings and declarations, setting forth what the parties apparently believed were salient portions of the record before the arbitrator as they related to his authority, and points and authorities submitted by each party. The court gave partial judgment as prayed for by the University and this appeal ensued.

We hold that the failure of the Association to request findings of facts and conclusions of law does not preclude review of that judgment of the trial court; that the question of whether the University's refusal to bargain with respect to the supplemental pension plan benefits would be an unfair labor practice is not relevant to the decision of this case; that the parties agreed to negotiate, and ar-

---

[1]As a result this court must apply federal substantive law to the issues raised on this appeal. (*O'Malley* v. *Wilshire Oil Co.* (1963) 59 Cal.2d 482, 486 [30 Cal.Rptr. 452, 381 P.2d 188]; *Northern Cal. Dist. Council of Hod Carriers* v. *Pennsylvania Pipeline, Inc.* (1980) 103 Cal. App.3d 163, 170 [162 Cal.Rptr. 851]; *Safeway Stores, Inc.* v. *Brotherhood of Teamsters* (1978) 83 Cal.App.3d 430, 435-436 [147 Cal.Rptr. 835]); *Butchers Union* v. *Farmers Market* (1977) 67 Cal.App.3d 905, 910 [136 Cal.Rptr. 894].)

bitrate, if necessary, with respect to those benefits; and that the trial court erred in vacating that portion of the award modifying those benefits.

The judgment must be reversed.

I

Preliminarily we reject the University's contention that, in the absence of findings of fact, the judgment must be affirmed because it must be presumed that the trial court found in favor of the respondent on every material issue. Code of Civil Procedure section 1291 requires the court to make findings of fact and conclusions of law whenever a judgment is made under the provisions of the code governing arbitration. (Code Civ. Proc., § 1280 et seq.) That section is interpreted in the light of Code of Civil Procedure section 632 and rule 232 of California Rules of Court. The Association failed to request such findings of fact and conclusions of law within 10 days after the trial court's notice of intended decision. It, therefore, is deemed to have waived any right to the same. (*Arrieta* v. *Paine, Webber, Jackson & Curtis, Inc.* (1976) 59 Cal.App.3d 322, 330-331 [130 Cal.Rptr. 534]; see also *Painters Dist. Council No. 33* v. *Moen* (1982) 128 Cal.App.3d 1032, 1042 [181 Cal.Rptr. 17]; *Golde* v. *Fox* (1979) 98 Cal.App.3d 167, 173-174 [159 Cal.Rptr. 864]; *Homestead Supplies, Inc.* v. *Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 984 [147 Cal.Rptr. 22]; *Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 861 [137 Cal.Rptr. 528]; *Hall* v. *Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 496 [138 Cal.Rptr. 725], cert. den. 431 U.S. 920 [53 L.Ed.2d 231, 97 S.Ct. 2187]; *Philbrick* v. *Huff* (1976) 60 Cal.App.3d 633, 650 [131 Cal.Rptr. 733]; *Small* v. *Smith* (1971) 16 Cal.App.3d 450, 455 [94 Cal.Rptr. 136].)

The University relies on the authorities last cited for the proposition that the appellate court, in the absence of findings, will not weigh the evidence to determine what is true and what is not, but will assume that the trial court found every fact essential to support the judgment. It will search the record for the purpose only of determining whether there is substantial evidence supporting the judgment, and will resolve all doubts in favor of the judgment. With the exception of one inference that the University requests we draw, as is discussed below (pt. III-A) there is no conflict in the facts in this case. The evidence consists of the August 30, 1977, collective bargaining agreement, the June 30, 1979, settlement agreement, and the salient portions of the record before the arbitrator.

It is well settled that findings are only required in arbitration matters upon a trial of questions of fact. Where the issue is one of law only, findings of fact are not required. (*Painters Dist. Council No. 33* v. *Moen, supra,* 128

Cal.App.3d 1032, 1042; *Homestead Supplies, Inc.* v. *Executive Life Ins. Co.,* *supra,* 81 Cal.App.3d 978, 984; *Johnston* v. *Security Ins. Co.* (1970) 6 Cal.App.3d 839, 844 [86 Cal.Rptr. 133]; *Allstate Ins. Co.* v. *Orlando* (1968) 262 Cal.App.2d 858, 867 [69 Cal.Rptr. 702]; and see *Charlton Co.* v. *Aerfab Corp.* (1976) 56 Cal.App.3d 808, 813 [128 Cal.Rptr. 878].)

■ Here the principal issue is whether the parties agreed to arbitrate, among other issues, the provisions of the original agreement covering the supplemental pension plan benefits. As has been stated, "In resolving this issue, we are guided by the rule that, contractual arbitration being a favored method of resolving disputes, every intendment will be indulged to give effect to such proceedings. [Citations.] And, since the matter is one of contract, the parties to an arbitration agreement are free to delineate the governing procedure; judicial review is thus strictly limited to a determination of whether the party resisting arbitration in fact agreed to arbitrate. [Citations.]" (*Painters Dist. Council No. 33* v. *Moen, supra,* 128 Cal.App.3d 1032, 1037.)

In reviewing the trial court's interpretation of the written instruments and the uncontradicted statements by the parties at the arbitration hearing, this court is not bound by the trial court's ruling but must give the contract its own interpretation. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Davies Machinery Co.* v. *Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 23 [113 Cal.Rptr. 784]; and see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 257-260, pp. 4248-4251.)

II

■ Respondent before the arbitrator, before the trial court, and now before this court, urges that the matter is controlled by "the landmark case" of *Chemical Workers* v. *Pittsburgh Glass* (1971) 404 U.S. 157 [30 L.Ed.2d 341, 92 S.Ct. 383]. There the United States Supreme Court held that retired workers are not "employees" whose ongoing benefits are embraced by the bargaining obligations of section 8(a)(5) of the National Labor Relations Act. The court concluded that an employer's unilateral modification of the retirement benefits, without bargaining with the union, representing working employees, which previously had secured those benefits, was not an unfair labor practice. (*Id.,* at pp. 159-160 [30 L.Ed.2d at p. 346].) The court distinguished between mandatory and permissive terms of bargaining and stated, "By once bargaining and agreeing on a permissive subject, the parties, naturally, do not make the subject a mandatory topic of future bargaining. When a proposed modification is to a permissive term, therefore, the purpose of facilitating accord on the proposal is not at all in point, since the parties are not required under the statute to bargain with respect to it." (*Id.,* at pp. 187-188 [30 L.Ed.2d at p. 362]; see also

*Westinghouse Electric Corp.* (1972) 195 N.L.R.B. 934; and *Union Carbide Corp.* (1972) 196 N.L.R.B. 22.)

We fail to see the relevancy of that holding to this case. The Association does not claim that the University was required by the National Labor Relations Act to bargain with respect to the rights under the supplemental pension plan. It claims that under the 1979 agreement, the University agreed to reopen and negotiate on an annual basis the economic matters embraced in article 20 which includes that plan; and, further, that the University expressly agreed that the mediator-arbitrator should determine whether or not changes, durations and modifications in that plan were within the scope of the arbitration submitted to him.

There is nothing in the *Chemical Workers* case to preclude such agreements. In answer to the Board's argument that the word "employee" in section 8(a)(5) should be construed to include retired workers, as had been the case with section 302(c)(5) dealing with pensions, the opinion notes, "Not to read the term that way, the Board contends, 'would frequently interject into welfare plan negotiations the troublesome threshold question whether particular proposals involved the administration of the written agreement, in which case the union would be entitled to represent retired employees, or its renegotiation, in which case . . . it would not.' " The court responded, "However, nothing we hold today precludes permissive bargaining over the benefits of already retired employees. . . ." (*Id.,* 404 U.S. at p. 171, fn. 11 [30 L.Ed.2d at pp. 352-353].)

Subsequently, the court pointed out that once active workers have bargained and secured pension rights, it might not be in the interests of their successors to bargain for increased rights for those who have retired, as distinguished from bargaining for increases in their own compensation. It observed, "Since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer. . . ." However, it added the following qualification, "This does not mean that when a union bargains for retirees—which nothing in this opinion precludes if the employer agrees—the retirees are without protection." (*Id.,* 404 U.S. at p. 181, fn. 20 [30 L.Ed.2d at pp. 358-359] and accompanying text.)

Finally, the court pointed out, "The remedy for a unilateral mid-term modification to a permissive term lies in an action for breach of contract . . . not in an unfair-labor-practice proceeding." (*Id.,* at p. 188 [30 L.Ed.2d at p. 363, fn. omitted.) Significantly the omitted footnote states: "It does not appear whether the collective-bargaining agreement involved in this cause provided for arbitration that would have been applicable to this dispute. We express no opinion, therefore, on the relevance of such a provision to the question

before us." (*Id.*, at p. 188, fn. 24 [30 L.Ed.2d at p. 363].) In this case the Association's position is that there is first a contract agreeing to the retired employees rights; secondly, a modification of that contract expressly agreeing to negotiate for the economic benefits so provided, with a provision for arbitration, and thirdly, an express agreement that the arbitrator should determine whether the retired employees' benefits are within the scope of the matters referred to him. Nothing in *Chemical Workers* precludes examination of those contractual rights.

The University points out that an attempt by existing actively employed members of the Association to force the University to bargain concerning the economic benefits of the supplemental pension plan might be considered an unfair labor practice. (See *Labor Board* v. *Borg-Warner Corp.* (1958) 356 U.S. 342 [2 L.Ed.2d 823, 78 S.Ct. 718].) Here there is no attempt to force a new issue. The Association contends it is merely seeking arbitration of an issue the University voluntarily agreed to arbitrate. In *United Steelworkers of America* v. *Canron, Inc.* (3d Cir. 1978) 580 F.2d 77, the employer similarly claimed that *Chemical Workers* precluded the union from seeking arbitration of a dispute over pension rights. The court pointed out that the issue was not whether the employer must bargain over the benefits of the retired employees of a predecessor corporation, but whether the employer, as successor, had in fact contractually committed itself to furnish such benefits in its existing contract with the union. (580 F.2d at pp. 80-81; see also *Local 589, Intern. Ladies' Garment* v. *Kellwood Co.* (8th Cir. 1979) 592 F.2d 1008, 1012; *Bressette* v. *International Talc Co., Inc.* (2d Cir. 1975) 527 F.2d 211, 215; *Butchers Union* v. *Farmers Markets, supra,* 67 Cal.App.3d 905, 915.)

We turn to the contractual terms as revealed by the record.

### III

The record reflects that on June 8, 1972, the University established a supplemental pension plan (SPP) for long-service faculty members on the basis of proposals from a faculty welfare committee and the University administration. It is designed to furnish supplemental benefits to employees who were employed before July 1, 1961, when a pension plan providing for annuities denominated TIAA was established, and who, because they were born before July 1, 1921, would not be able to acquire 25 years of service under the 1961 plan before attaining age 65. On December 17, 1981, there were 27 former faculty members who had retired and were receiving supplemental pensions; and at that time there were 8 individuals, not then receiving such benefits, but eligible to receive them in the future. Of those eight, five were then currently active members of the faculty; another, a law school librarian, was not a

member of the Association—the bargaining unit—and two were not active employees of the University.

A comprehensive collective bargaining agreement between the University and the Association was executed August 30, 1977, to cover the period from July 1, 1976, through June 30, 1981. Article 19, consisting of three paragraphs, dealt with "Salaries," and article 20, entitled "Benefits," covered the general "Retirement Plan," and eight other subjects, including section 20.9 which reads as set forth in the margin.[2]

On June 7, 1979, the parties signed a four-page agreement entitled "Settlement of 1979 Negotiations between USF and USF Faculty Association." The agreement purports to settle, with the reservation of one pending individual grievance, all disputes pending between the parties, including actions brought by the Association against the University involving negotiations and an impasse in the year 1978-1979. Further provisions provided expressly for settlement of economic matters in the years 1978-1979, 1979-1980 and in 1980-1981, the last year of the 1977 agreement. The original agreement as modified was extended through June 30, 1986, and each party agreed that there would be no strike or lockout until it expired.

The modifications, which govern the 1981-1982 year that is in question in these proceedings, are set forth in the margin.[3]

---

[2]"20.9 SUPPLEMENTAL PENSION PLAN

"The University maintains a supplemental pension plan for those members of the Association that were employed by the University prior to July 1, 1961, and were born prior to July 1, 1921. The annual Supplementary Pension Plan payment to eligible participants shall be 2% of the total salary earned from the date of employment to July 1, 1961. The eligible participants were informed of the plan and the amount of the annual pension payment in a written notification dated July 8, 1972."

[3]"2. Subarticle 19.4 to be added to Article 19 to read: 'Effective July 1, 1981, and until the conclusion of this Agreement on June 30, 1986. Subarticles 19.1, 19.2 and 19.3 are null and void and all salary issues become subject to annual negotiation and the dispute resolution procedure described in Section 3 of this Settlement Agreement.'

"3. Article 19 (including 19.4), 20 and Article 21.18 (all of which are economic matters) shall be subject to reopening by either party to negotiate with respect to changes, durations and modifications on an annual basis, subject however, to the following resolution of an impasse:

"a) Parties shall present their demands in accordance with the Contract, and in good faith bargain concerning the terms and conditions presented within the scope of these Articles. If the parties are unable to reach an Agreement and either party requests it, the Arbitrator specified in the Agreement (Adolph Koven) will be appointed as a Mediator-Arbitrator. If the Med-Arb procedure results in an impasse on any issue it shall be submitted to Mr. Koven . . . at the request of either party, . . . to resolve the matter and 'fashion a remedy' to resolve the impasse. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"c) The decision of the mediator-arbitrator . . . shall be final and binding on the parties to the Agreement."

Deletions deal with submission to a tripartite panel, not requested in these proceedings, and fees and expenses of the arbitration.

From the provisions of paragraph "3" of the 1979 agreement, it is clear that the provisions of section 20.9 (fn. 2, *ante*) as a part of article 20, were subject to reopening by either party to negotiate with respect to changes, duration and modifications on an annual basis, and subject to resolution as provided in that paragraph if the parties failed to reach agreement.

At the arbitration hearing the University voiced its opposition to any changes in the supplemental pension plan on two grounds. First, it asserted that because of the nature of the plan and the manner in which it was created there could be no adjustment in the established level of benefits without the approval of the board of trustees of the University, that any increase would constitute an improper insertion of a new term in the contract for that pension, and so would exceed the scope of the arbitration. Secondly, it argued that since under the *Chemical Workers* case the modification of benefits for persons already retired is a permissive rather than a mandatory subject of negotiations the arbitrator had no authority to require a modification over the opposition of the University.

Later in the proceedings the arbitrator requested the University's representative to clarify the record. He pointed out that the University had urged that certain matters were not arbitrable, more particularly, he stated, "With respect to the supplemental pension, again you said—and these are words of art that are used in our business—'exceeds the scope of this arbitration.'" He continued, "what I need to know for this record is whether you agree that I have the right to decide what my jurisdiction is.

". . . . . . . . . . . . . . . . . . . . . .

"So that if I should decide that those are within the scope of . . . my arbitrable jurisdiction . . . you stipulated to that?" Counsel answered, "Yes."

Over objections that neither was an arbitrable matter, the arbitrator's award included a provision that the "step system" of compensation should be continued and that the supplemental pension plan should be increased. The award attacked by the University in these proceedings reads: "(5) Supplemental Pension Plan (SPP): An increase is granted on a pro rate basis by the University to all those currently receiving SPP and to those eligible for SPP by an amount equal to 1% of total salary cost for 1981-82."

## A

Both parties refer to cases found in the "Steelworker's Trilogy," *Steelworkers* v. *American Mfg. Co.* (1960) 363 U.S. 564 [4 L.Ed.2d 1403, 80 S.Ct. 1343]; *Steelworkers* v. *Warrior & Gulf Co.* (1960) 363 U.S. 574 [4 L.Ed.2d

1409, 80 S.Ct. 1347]; *Steelworkers* v. *Enterprise Corp.* (1960) 363 U.S. 593 [4 L.Ed.2d 1424, 80 S.Ct. 1358]. The University finds comfort in a footnote in the second case. It reads: "It is clear that under both the agreement in this case and that involved in *American Manufacturing Co., ante,* p. 564, the question of arbitrability is for the courts to decide. [Citation.] Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose." (363 U.S. at p. 583, fn. 7 [4 L.Ed.2d at p. 1418]; see also, *O'Malley* v. *Wilshire Oil Co., supra,* 59 Cal.2d 482, 490-491; *O'Malley* v. *Petroleum Maintenance Co.* (1957) 48 Cal.2d 107, 110 [308 P.2d 9]; *Northern Cal. Dist. Council of Hod Carriers* v. *Pennsylvania Pipeline, Inc., supra,* 103 Cal.App.3d 163, 170; and *Inter. Broth. of Teamsters, etc.* v. *Wash. Emp.* (9th Cir. 1977) 557 F.2d 1345, 1349.)

The University asks us to distinguish between its objection that any modification of the supplemental pension plan would exceed the scope of the arbitration because it would force a material change in provisions which could only be altered by action of its board of trustees, and its objection to changing benefits for those already retired under the plan on the basis of the rule in *Chemical Workers.* (See pt. II above.) It admits the former objection was submitted to the arbitrator but not the latter. The distinction, in the light of what was said is tenuous at best, but in view of our analysis of *Chemical Workers* becomes immaterial. (Cf. pt. II, above.) We further note that although the University argued that the reinstatement of salary steps was not an arbitrable matter, it did acquiesce in that part of the award that so provided.

B

More to the point is the general holding of the "Steelworkers' Trilogy" as interpreted in *Posner* v. *Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169 [14 Cal.Rptr. 297, 363 P.2d 313] and reiterated in *O'Malley* v. *Wilshire Oil Co., supra,* 59 Cal.2d 482, as follows: "This rule is to the effect that, where the collective bargaining agreement provides for arbitration of all disputes pertaining to the meaning, interpretation and application of the collective bargaining agreement and its provisions, any dispute as to the meaning, interpretation and application of any specific matter covered by the collective bargaining agreement is a matter for arbitration. Doubts as to whether the arbitration clause applies are to be resolved in favor of coverage. The parties have contracted for an arbitrator's decision and not for that of the courts." (56 Cal.2d at p. 175 and 59 Cal.2d at p. 487; see also *Taylor* v. *Crane* (1979) 24 Cal.3d 442, 450 [155 Cal.Rptr. 695, 595 P.2d 129]; *Morris* v. *Zuckerman* (1968) 69 Cal.2d 686, 690 [72 Cal.Rptr. 880, 446 P.2d 1000]; *Stockton Metropolitan Transit Dist.* v.

*Amalgamated Transit Union* (1982) 132 Cal.App.3d 203, 210, 213 [183 Cal. Rptr. 24]; *Local 589, Intern. Ladies Garment* v. *Kellwood Co., supra,* 592 F.2d 1008, 1011; *United Steelworkers of America* v. *Canron, Inc., supra,* 580 F.2d 77, 82; *Bressette* v. *International Talc Co., Inc., supra,* 527 F.2d 211, 214; *Chattanooga Mailers* v. *Chattanooga News-Free Press* (6th Cir. 1975) 524 F.2d 1305, 1314-1315; *United Steelwkrs. of Amer.* v. *General Steel Indus., Inc.* (8th Cir. 1974) 499 F.2d 215, 219; and *Builders Ass'n of Kansas City* v. *Greater Kansas City Lab. D. C.* (8th Cir. 1964) 326 F.2d 867, 869.)

The 1977 agreement provides for "Grievance Procedures" in article 10 and "Arbitration" in article 11. Insofar as those provisions are continued in force by the 1979 agreement and may be applicable to proceedings taken under the later agreement, they add nothing to the University's position.[4] Paragraph 10.1 indicates that "unless otherwise specified, any dispute as to the application or interpretation of" (the 1977 agreement) shall be subject to the provisions for grievances and arbitration found in articles 10 and 11.[5] That provision would bring the proceedings into the orbit of the principles expounded in the "Steelworkers Trilogy." ▮ It is unnecessary to pursue that approach because the 1979 contract and the discussion at the hearing both demonstrate that the benefits of the supplemental pension provisions were properly a subject of arbitration. It is clear that one contract may provide for arbitration of terms of a new contract. (*Chattanooga Mailers* v. *Chattanooga News-Free Press, supra,* 524 F.2d 1305, 1314-1315; *Winston-Salem Printing Press & A. U.* v. *Piedmont Pub. Co., supra,* 393 F.2d 221, 224-227; and *Builders Ass'n of Kansas City* v. *Greater Kansas City Lab. D. C., supra,* 326 F.2d 867, 869-870.) That is exactly what the parties did in 1979 by agreeing to negotiate and arbitrate, if necessary, any change in the benefits covered by article 20.

It is likewise established that the parties may stipulate to submit to binding arbitration the issue of whether a particular dispute is in fact arbitrable. (*O'Malley* v. *Petroleum Maintenance Co., supra,* 48 Cal.2d 107, 110; *Fidelity & Cas. Co.* v. *Dennis* (1964) 229 Cal.App.2d 541, 543 [40 Cal.Rptr. 418]; *Intern.*

---

[4] We note, however, that in *Stockton Metropolitan Transit Dist.* v. *Amalgamated Transit Union, supra,* a distinction was drawn between interest or contract or quasi legislative arbitration, such as is the subject of paragraph 3 of the 1979 agreement, and grievance arbitration as is provided in articles 10 and 11 of the 1977 agreement. (132 Cal.App.3d 203, 210; see also *Chattanooga News-Free Press, supra,* 524 F.2d 1305, 1313; *Winston-Salem Printing Press. & A. U.* v. *Piedmont Pub. Co.* (4th Cir. 1968) 393 F.2d 221, 223-224.)

[5] This paragraph reads: "10.1. The purpose of this Article is to provide the sole method for the settlement of a complaint alleging that a specific provision of this Agreement has been violated. It is the intent of the Parties that, unless otherwise specified, any dispute as to the application or interpretation of this Agreement shall be subject to the provisions of Articles 10 and 11 of this Agreement. Such a complaint shall be defined as a grievance under this Agreement and must be presented and be processed in accordance with the following steps, time limits and conditions set forth herein."

*Broth. of Teamsters, etc.* v. *Wash. Emp., supra,* 557 F.2d 1345, 1349; and see *Southside Theatres* v. *Moving P. Local* (1955) 131 Cal.App.2d 798, 802-803 [281 P.2d 31].) A fair reading of the record reflects that that was done at the hearing in front of the arbitrator.

Since the parties stipulated that the arbitrator would have the right to decide what his jurisdiction was the University cannot now contend that the arbitrator lacked jurisdiction to decide the issue. (*Syufy Enterprises* v. *Northern Cal. State Ass'n.* (9th Cir. 1980) 631 F.2d 124, 125.) A claimant may not voluntarily submit his claim to arbitration, await the outcome, and if the decision is unfavorable, challenge the authority of the arbitrator to act. (*O'Malley* v. *Petroleum Maintenance Co., supra,* 48 Cal.2d 107, 110-111; *Fidelity & Cas. Co.* v. *Dennis, supra,* 229 Cal.App.2d 541, 544; *Ficek* v. *Southern Pacific Company* (9th Cir. 1964) 338 F.2d 655, 657.)

C

Article 11, "Arbitration," in the 1977 agreement contains the following provision: "11.6. The Arbitrator shall have no authority to add to, subtract from, modify, change, alter or ignore in any way the provisions of this Agreement or any expressly written amendment or supplement thereto, or to extend its duration, unless the Parties have expressly agreed, in writing, to give him specific authority to do so, or to make an award which has this effect. The award of the Arbitrator so made shall be final and binding on the Parties." Assuming that this clause applies to the interest arbitration provided by the 1979 agreement, the University contends that its representative could not orally give the arbitrator the power to decide that he had jurisdiction to modify or change the benefits of the supplemental pension plan. This overlooks the fact that the 1979 written agreement specifically includes the provisions of that plan as referred to in section 20.9 of article 20 as subject to negotiation, with respect to changes, durations and modifications, and to arbitration if an agreement was not reached. The fact the supplemental pension plan was the subject of a separate agreement did not render it exempt from further negotiation and arbitration when the parties had so agreed. (See *Bressette* v. *International Talc Co., Inc., supra,* 527 F.2d 211, 216; *United Steelwkrs. of Amer.* v. *General Steel Indus., Inc., supra,* 499 F.2d 215, 218-219.)

In construing similar limiting language, the court in *O'Malley* v. *Wilshire Oil Co., supra,* concluded: "To state that the arbitrator lacks power to amend, modify or otherwise change an agreement is merely to restate explicitly the inherent limitation in the arbitrator's power to handle grievances relating to the *'application and interpretation of this Agreement.'* If the provision empowers the arbitrator only to apply and interpret the agreement, he is not authorized to

amend it." (59 Cal.2d at p. 493, italics in original, fn. omitted.) So here the arbitrator in interpreting the 1979 agreement as embracing the negotiations for supplemental pension plan benefits was not amending the 1977 agreement as modified and extended in 1979, but applying and interpreting it.

## D

■ Finally, the University asserts that the arbitrator erred in including all those currently receiving benefits under the supplemental pension plan, because the association had no authority to bargain for them. The 1977 agreement defines "'Members of the Bargaining Unit': The full-time faculty and non-administrative full-time professional librarians as set forth more fully in Sections 1.1 and 1.2 of the agreement, hereinafter variously referred to as 'members.'" Paragraph 1.1 recites that the University recognizes the Association as the exclusive collective bargaining representative of all full-time faculty members and all nonadministrative full-time professionals in the unit described below, for the purpose of collective bargaining with respect to wages, hours and conditions of employment. Paragraph 1.2 defines the unit as acting employees. The question of the persons for whom the Association could bargain, i.e., retired employees, as well as members of the bargaining unit involved a question of the interpretation of the 1979 agreement, which as we have seen embraced section 20.9. That section included members of the Association who were employed prior to July 1, 1961, and were born prior to July 1, 1921. Five persons, so classified admittedly were members of the bargaining unit, the 27 actually retired are apparently excluded. As we have seen in our discussion of *Chemical Workers* (pt. I), when the parties so agree they may bargain for those already retired. By agreeing in 1979 to negotiate and arbitrate the benefits in section 20.9, the University conferred upon the Association the right to bargain for those who were entitled to those benefits, both retirees and active members of the Association.

## IV

■ "The role of a court in reviewing the validity of an arbitration award under a collective bargaining agreement is an extremely narrow one. Findings on questions of law or fact by the arbitrator are final and conclusive. Neither the merits of the controversy nor the sufficiency of the evidence to support the arbitrator's award are matters for judicial review. A court must affirm an arbitrator's award if it can in any rational way be derived from the agreement, and can only reverse if there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop [citation]." (*Northern Cal. Dist. Council of Hod Carriers* v. *Pennsylvania Pipeline, Inc., supra,* 103 Cal.App.3d 163, 170.) Here we believe the trial court was led

to stray from the foregoing principle by the University's insistence that it should apply principles governing unfair labor practices, rather than looking to the contractual relations of the parties. Parenthetically we note that the partial vacating of the award would leave the parties in economic imbalance. If, as ruled, the award was incomplete in one respect because unauthorized, the proper procedure would be to refer all back to the arbitrator. (See *Safeway Stores, Inc.* v. *Brotherhood of Teamsters, supra,* 83 Cal.App.3d 430, 439-442.)

The judgment is reversed with direction to enter judgment confirming the entire award as set forth by the arbitrator on November 20, 1981.

White, P. J., and Scott, J., concurred.