Filed 5/8/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TODD KURTIN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>BRUCE ELIEFF,<br><br>    Defendant and Appellant. | G043999<br><br>(Super. Ct. No. 30-2007-00100307)<br><br>ORDER DENYING REHEARING AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |

The petition for rehearing filed April 30, 2013 is DENIED.

The opinion filed April 16, 2013 is hereby modified in the following particulars:

(1) On page 5 of the slip opinion, in the first sentence of the first full paragraph, delete the words "including Moorpark and SJD" so that the sentence reads: "After the arbitration, Kurtin filed this action against Elieff and the Joint Entities."

(2)  On page 22 of the slip opinion, in the first sentence of the first full paragraph, the word "not" should be inserted between "are" and "necessarily" so that the sentence reads:  "Third, and most importantly, the last antecedent rule strongly indicates the arbitrator's powers are not necessarily pinned down by a requirement to only be exercised to 'save' the agreement."

These modifications do not affect the judgment.


                                        RYLAARSDAM, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

Filed 4/16/13 (opn. on rehearing) (unmodified version.)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TODD KURTIN, | |
| Plaintiff and Appellant, | G043999 |
| v. | (Super. Ct. No. 30-2007-00100307) |
| BRUCE ELIEFF, | O P I N I O N |
| Defendant and Appellant. | |

Appeals from a judgment and two orders of the Superior Court of Orange County, Nancy Wieben Stock, Judge. Judgment affirmed; one order affirmed; one order affirmed as modified.

Miller Barondness, Louis R. Miller, Daniel S. Miller; Snell & Wilmer, Richard A. Derevan, Todd E. Lundell and Andreea V. Micklis for Plaintiff and Appellant.

Andersen Hilbert & Parker, M. Steven Andersen, Jeffrey N. Garland, Jason L. Satterly; Luce, Forward, Hamilton & Scripps; McKenna Long and Aldridge and Charles A. Bird for Defendant and Appellant.

\* \* \*

We affirm the trial court's judgment holding defendant Bruce Elieff liable for misstating his authority to bind a group of real estate businesses known as the "Joint Entities" in the course of agreeing to buy out his former partner, plaintiff Todd Kurtin. We affirm the trial court's posttrial order denying Elieff's motion for judgment notwithstanding the verdict. And we affirm the trial court's grant of a new trial as to the issue of the precise amount of damages which Kurtin may recover.

However, as to one of Kurtin's causes of action – for liability under Civil Code section 2343 for lack-of-good-faith breach of an agent's warranty of authority – the new trial order must extend to liability as well. (All further statutory references to sections 2343, 2342, or 3318 will be to the Civil Code.) The jury returned inconsistent verdicts. Liability under section 2343 requires either (1) the *lack* of a good faith belief on an agent's part that "he has authority" to bind "his principal," or (2) an act by the agent that is "wrongful" in its nature. Case law has equated "wrongful" with tortious. Here, the jury found that Elieff *did* have a good faith belief in his authority to bind what the parties refer to as the Joint Entities when he signed the agreement. Furthermore, the jury specifically *exonerated* Elieff of all tort claims presented against him to the jury, including even the claim for negligent misrepresentation.

The proper remedy for inconsistent verdicts is a new trial. (See *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344 (*Shaw*) ["Inconsistent verdicts are ""against the law,"" and the proper remedy is a new trial."].) Accordingly, we will modify the new trial order on appeal to provide for the trial of liability under section 2343, as well as damages. (Code Civ. Proc., § 906.) As modified, we affirm that new trial order.

BACKGROUND

1. *The 2005 Settlement Agreement*

Kurtin and Elieff had been equal partners in a series of real estate ventures in the 1990's, doing business under the rubric of SunCal Companies. In 2003, growing

2

disagreements between the two led Kurtin to sue Elieff to "separate" themselves. By that time SunCal Companies had already been "transformed" into "basically" Elieff's company.

The litigation led to a mediation, which in turn led to a settlement agreement. The agreement, signed in August 2005, provided that Elieff was to buy out Kurtin for $48.8 million in four installment payments.

As Kurtin and Elieff structured their partnership, each real estate project was its "own little company." The settlement agreement provided that of the $48.8 million, both Elieff and the Joint Entities were jointly and severally responsible for the first installment of $21 million. However, only the Joint Entities were responsible for making the last three installments.

## 2. Default on the Payments

Elieff made the $21 million first and only installment payment for which he could be held personally responsible. The Joint Entities made the $1.8 million second installment payment for which they alone were responsible. But the Joint Entities paid only about $3.5 million of the $13.1 million third installment payment, and nothing on the final installment of $12.9 million.

Elieff had signed the settlement agreement both "individually and on behalf of the Elieff Separate Entities and the Joint Entities." The agreement had provided that if there was a default in any of the last three payments, Kurtin would be "entitled to have judgment entered pursuant to C.C.P. Section 664.6 against the Joint Entities" in an amount equal to the unpaid balance.

But when Kurtin sought to enforce the agreement against the Joint Entities under section 664.6 of the Code of Civil Procedure in the context of the 2003 litigation, the trial judge denied his request. The judge determined that the Joint Entities were not "parties" to Kurtin's 2003 litigation.

3

Elieff opposed the attempt to enforce the agreement. He argued that the trial judge had correctly determined the Joint Entities had to be added as parties to the lawsuit before any judgment could be entered against them.

The trial judge did not address the question of whether Elieff had the authority to bind the Joint Entities. However, in opposition to a writ petition filed in this court by Kurtin contesting the trial court's order, Elieff pointed out that "some of the Joint Entities are majority owned by independent third-parties," and further asserted "that only *his* interest in the Joint Entities, if anything, is subject to legal action." (Italics in original.) Pursuant to Evidence Code section 452, subdivision (d), on our own motion we have taken judicial notice of the records in writ proceeding in this court's docket number G037647.

Two of the Joint Entities, Moorpark 150 LLC (Moorpark), and SJD Partners (SJD), appeared through their own counsel, and argued that Elieff did not have any authority to bind their assets "to resolve his personal dispute with Kurtin." As they asserted in opposing the writ relief sought by Kurtin, Elieff "might as well have pledged the Brooklyn Bridge to Kurtin."

Elieff further argued that Kurtin had an adequate remedy at law. Besides Kurtin's bringing the Joint Entities into the case, Elieff took the position that Kurtin could either (1) demand arbitration under the arbitration clause of the settlement agreement, or (2) sue for breach of the settlement agreement.

*3. Arbitration*

Kurtin never tried to bring the Joint Entities into the case. Instead he sought arbitration. We will recount the relevant facts involving the arbitration when we discuss whether the arbitration decision precludes *any* judgment against Elieff in more detail. For the moment, we need only note two things about the result of the arbitration. First, the arbitrator determined that the amount owing to Kurtin was $24,411,433.86.

4

Second, the arbitrator announced a decision that only gave Kurtin the right, along the lines previously advocated by Elieff's attorneys in the writ proceeding, to foreclose on Elieff's *own* interests in the Joint Entities to the extent of that amount.

### 4. The Litigation

#### a. Phase 1 accounting

After the arbitration, Kurtin filed this action against Elieff and the Joint Entities, including Moorpark and SJD. A "distribution" clause in the settlement agreement prompted the trial judge to propose a bifurcated trial. The clause provided that "Elieff shall not take any distribution from any of the Joint Entities if such distribution prevents satisfaction of payment of the Settlement Payments." With reference to that clause, trial judge noted that Kurtin was "alleging certain causes of action concerning how the defendant handled certain funds or assets of" the Joint Entities. There was thus a "sub-issue" as to whether "distributions are measured in every entity at the very moment they emerge or whether the alleged pre-existing practice treating the joint entities as a single unified economic force allows somebody to exercise the business judgment to consider it more as a whole and utilize what might be considered net profit from one entity to help preserve the viability of another entity for the purpose allegedly of making more money for everybody as to all the entities." That is, the judge was concerned whether, if Elieff moved money around from one entity to another for the purpose of maximizing total aggregate profit, such movement might constitute a violation of the agreement.

Phase 1 of the bifurcated proceedings consisted of a five-day trial "concerning the accounting issues arising out" of Kurtin's claim that Elieff had breached the settlement agreement by, among other things, taking distributions from entities that prevented repayment of remaining payments. Kurtin had charged that some $22.4 million of "distributions" had been diverted to Elieff himself or Elieff-controlled entities.

5

After hearing evidence, the court made certain, limited, findings. The "evidence received by the Court," said the judge, "has, in fact, accounted for every penny of the funds that could be classified in any way as a distribution from a joint entity in the period following the August 2005 settlement agreement."

But the "every penny" comment did not mean the trial judge was ruling that Elieff had taken no "distributions" in contravention of the agreement. In fact, the trial judge did not actually define the word with the exception of ruling, as a matter of law, that the word "distribution" could not "be interpreted as precluding any and all distributions from being utilized for the good of the whole"

### b. *Phase 2 jury trial*

The result of phase 1 was an elaborate jury instruction (Jury Instruction No. 10 in the record). The jury instruction encapsulates what happened at phase 1. In summary, the court ruled – and only ruled – that the $22.4 million in "distributions" fell into one of five categories, and left to the jury the task of deciding whether money falling into any given one of those categories was a "distribution" in contravention of the settlement agreement. We quote the relevant parts:

"At an earlier trial, the Court found that after the Settlement Agreement between Mr. Elieff and Mr. Kurtin was signed, Mr. Elieff used distributions of money from various of the Joint Entities in the total amount of $22,384,632.22. . . . The Court found that all of this money was used by Mr. Elieff in the following five categories: (1) management services; (2) management expenses; (3) management costs; (4) loan repayment or return of capital; and (5) payments to Mr. Kurtin. . . . [¶] The Court did not decide whether the taking of these distributions of money did or did not violate Paragraph 14 of the Settlement Agreement. The Court found that Paragraph 14 does not preclude Mr. Elieff from taking distributions from the Joint Entities, so long as the

6

distributions were used to enhance, and not prevent or jeopardize, the possibility of Mr. Kurtin being paid the Settlement Payments required under the Settlement Agreement."

Attached to the instruction was a chart giving the jury a list of 19 specific money outflows totaling $22,384,632.22 from various of the Joint Entities, and a recapitulation of the five categories (management services, management expenses, and so on) which the judge had identified. Fourteen of the 19 outflows listed told the jury only that the court had made "no specific findings other than to conclude that the amount distributed was used for one or more" of those categories. For example: Item number 4 showed that on November 6, 2006, $1.5 million from one entity, Serrano Heights East, went into "one or more" of those five categories.

The remaining five outflows were more specific. About $4 million was used (by Rancho Etiwanda 685 and Serrano Heights East) to reimburse "Elieff/SunCal" for "costs incurred on joint projects." Another outflow from Moorpark Equity Partners consisted of $1 million to repay a deposit from a third party, another $250,000 going to pay a third-party owner, with the balance (roughly half a million dollars) going either to Moorpark Equity Partners itself ($263,000) or to reimburse "Elieff/SunCal for advances made by Elieff" ($241,500). Only one item, a $1.8 million outflow from Rancho Etiwanda, was unambiguously shown to have been used to repay Kurtin. (Presumably this was the same $1.8 million referenced above as the second installment payment.)

Even though the settlement agreement had not personally obligated Elieff to pay more than $21 million of the $48.8 buyout price, Kurtin sought recovery from Elieff on the theory that Elieff had misrepresented his authority to obligate the Joint Entities to pay the balance. Concomitantly, Kurtin also claimed that Elieff had breached a provision in the settlement agreement to execute the customary documents "necessary to perfect this security interest" in Elieff's interests in the Joint Entities. And, as just discussed, Kurtin asserted that Elieff had taken distributions from the Joint Entities that should have gone to pay off the buyout price.

7

From these basic claims the following six causes of action against Elieff were submitted to the jury: number 2, for breach of warranty of an agent's authority under section 2342; number 3, for breach of warranty of an agent's authority under section 2343; number 4, for fraud or intentional misrepresentation in representing to Kurtin that he had the authority to sign for the Joint Entities; number 5, for negligently misrepresenting that he had the authority to sign for the Joint Entities; number 6, for breaching the provision of the settlement agreement that he would execute the documents necessary to perfect Kurtin's security interests in Elieff's share of the Joint Entities; and number 7, for breaching the provision of the settlement agreement not to take distributions which prevented the Joint Entities from paying the balance of the buyout amount.

The jury, however, came back with an anomalous result. On the one hand, it found Elieff liable for breaching the warranty of authority under both sections 2342 and 2343, and in each case determined the amount of damage to be $24,411,433.86, which was the exact amount the arbitrator had determined was owing on the unpaid balance. The jury further determined that Elieff had breached the provision requiring him to provide Kurtin with perfected security interests in Elieff's interests in the Joint Entities. And it likewise determined that Elieff had breached the provision precluding him from taking distributions that prevented the Joint Entities from paying off the balance of the $48.8 million. And, again, in each case the jury assessed Kurtin's damages at exactly $24,411,433.86.

But on the other hand the jury exonerated Elieff on both the intentional and negligent misrepresentation causes of action. It specifically found, in answering the special verdict form, that Elieff did not know his representation that he had authority to obligate the Joint Entities was false when he made it. And it specifically found that Elieff did not make the representation recklessly and without regard for its truth. Further, the jury concluded that Elieff did not lack reasonable grounds to believe his representation

8

was true when he made it.  Likewise, the jury found, in answering the special verdict form in regard to liability under section 2343, that Elieff did *not* "lack a good faith belief" in his authority to sign on behalf of the Joint Entities.

But then again, the jury found liability under section 2343 because Elieff had committed an act "wrongful in its nature" when he signed on behalf of the Joint Entities.  As we discuss in more detail below, Kurtin's counsel had argued to the jury that the precise acts committed by Elieff that were "wrongful in their nature" were the alleged intentional and negligent misrepresentations, and yet the jury absolved Elieff of both intentional and negligent misrepresentation.

### c.  Judgment, posttrial motions and appeal

Judgment was filed May 17, 2010, decreeing that Kurtin recover $24,411,433.86 from Elieff.  Within 12 days Elieff gave notice of his intent to move for new trial.  The notice was supported by four juror declarations all stating that the jury "solely" looked at the $24,411,433.86 from the arbitration decision, and (as stated in each of the four declarations) did not discuss or "look at any other evidence to determine damages."  The new trial motion focused on the anomaly of liability under section 2343 in light of the jury's exoneration of Elieff on the intentional and negligent misrepresentation claims.  The motion further pointed out that even Kurtin's own counsel had not asked the jury for damages in excess of $8 million on the violation of the no-distribution clause.  Elieff also filed a motion for judgment notwithstanding the verdict (JNOV).

The trial judge denied the motion for JNOV, but granted the new trial motion as to damages only.  The judge reasoned that the evidence would not support a $24,411,433.86 verdict on any of the four causes of action on which Kurtin had prevailed.  The court noted that the $24,411,433.86 figure "exceeded the total amount of all" distributions from the Joint Entities, and even exceeded "Kurtin's argued-for

9

damages of $7,852,222.22."  The judge in particular rejected Kurtin's argument that the $24,411,433.86 might be justified under section 2343 on the theory that Elieff's "'wrongful acts'" subjected him to the "full liability of his principal."  She ruled that damages under section 2343 were governed by section 3318, and under section 3318, Elieff could only be liable for what Kurtin could have "recovered and collected" from the Joint Entities.

Elieff filed a timely notice of appeal, challenging the judgment, the order denying the JNOV motion, and the order granting in part and denying in part his motion for new trial.  Kurtin countered with a notice of cross-appeal, also challenging the order granting in part and denying in part the new trial motion.

DISCUSSION

*1. The Effect of the Arbitration*

Elieff contends that the arbitration decision precludes the subsequent civil court judgment (either by way of res judicata or collateral estoppel, or both).  Because the arbitration issue most clearly brings the various textual provisions of the settlement agreement into sharp relief, we now set them forth:

*a. Relevant terms of the settlement agreement*

A number of particular features of the settlement agreement are relevant.  First, the recitations at the beginning purport to treat Elieff and the Joint Entities as one collective entity.  ("This Settlement Agreement is entered into . . . between Todd Kurtin . . . and Bruce Elieff, the Elieff Separate Entities identified in Exhibit 'A' and the Joint Projects identified in Exhibit 'B' on the other hand (collectively 'Elieff').")

Second, the text of the agreement is clear that Elieff personally was only responsible for the initial $21 million installment payment, and not for the balance contemplated to come from the Joint Entities.  The point is made in three separate

10

instances.  Paragraph 2 directly says it:  "Elieff and each of the Joint Entities are jointly and severally liable for making the first Settlement Payment in the amount of $21,000,000.  The Joint Entities are liable for making the remainder of the Settlement Payments."  Paragraph 3 strongly implies it, both by (a) defining default in terms of the particular "Elieff Party obligated to pay" (thus excluding Elieff parties, like Elieff himself, *not* obligated to pay) and also by (b) specifically separating Kurtin's remedy for failure to pay the first installment from failure to pay the other installments.

Third, the text of the settlement agreement contemplates that the assets of the Joint Entities would secure the obligations of the Joint Entities under the agreement. It does so in paragraph 14 by both requiring Elieff personally to "execute customary documents necessary to perfect" a security interest to be held by Kurtin and by preventing Elieff from taking distributions which impair that security.  Rather than attempting to paraphrase the remainder of that paragraph, we now quote it in full: "Payment to Kurtin of the Settlement Payments shall be secured by the interest of Elieff and the Joint Entities in the projects owned by the Joint Entities.  Elieff and the Joint Entities shall execute customary documents necessary to perfect this security interest, including UCC-1 filings, provided however that Kurtin shall, within ten (10) business days of written notice execute those consents and/or subordination agreements necessary for Elieff to refinance the Pacific Point project.  Elieff shall not take any distribution from any of the Joint Entities if such distribution prevents satisfaction of payment of the Settlement Payments."

Fourth, paragraph 15 of the settlement agreement contains an arbitration clause.  The arbitration clause reads:  "The Parties believe that all of the material terms of their agreement are set forth herein.  It is the intent of the parties that this Settlement Agreement shall be final and binding and that this Settlement Agreement shall be enforceable under C.C.P. Section 664.6.  In the event that any Party claims that one or more material terms have been omitted from this Settlement Agreement, or that the

11

Parties failed to reach an agreement as to one or more material terms, or that any other defect exists with respect to this Settlement Agreement that would make it unenforceable, the Parties agree to final and binding arbitration before Tony Piazza or, if Mr. Piazza is unable, before a mutually agreeable arbitrator. At such arbitration, the arbitrator shall imply a reasonable term that the arbitrator finds consistent with the purpose and intent of this Settlement Agreement or otherwise cure any defect in the Settlement Agreement by amending its terms. The sole act of the arbitrator shall be to issue an amendment to this Settlement Agreement implying such additional terms, curing any ambiguity or otherwise curing any defect in this Settlement Agreement that would make this Settlement Agreement unenforceable. The Settlement Agreement, together with any amendment issued by the arbitrator, shall be enforceable under C.C.P. Section 664.6."

Finally, in paragraph 17, the agreement contains an integration clause: "This agreement contains the entire and only understanding between the Parties pertaining to the subject matter contained in it and supersedes any and all prior and/or contemporaneous oral or written negotiations, agreements, representations and understandings. This agreement shall be governed by California law."

### b. The arbitration award

Despite the "sole act" language in the settlement agreement, at the arbitration Kurtin sought a direct award for the balance due. His arbitration brief asserted: "Therefore, the arbitration award here should include an award against Elieff personally for the principal balance owing under the Settlement Agreement which, as explained below, is now $22,934,809.16 plus interest, attorney's fees and costs in an amount according to proof at the hearing."

What Kurtin received, however, was in substance simply an amendment to the terms of the settlement agreement. The arbitrator decreed that any recovery against Elieff would be restricted to *Elieff's own* interests in the Joint Entities, as distinct from

12

the total assets of the Joint Entities themselves: "If payment of $24,411,433.86 is not made to Todd Kurtin by June 30, 2007, then Kurtin shall have the right to require Bruce Elieff to transfer to Kurtin or his designee by July 10, 2007, any and all of Elieff's right, title and interest - held directly or indirectly - in and to any or all of the Joint Entities listed on 'Exhibit B' to the Settlement Agreement of August 5, 2005 and Elieff shall promptly execute all documents necessary to effectuate such transfer."

The narrowness of the arbitrator's decision (it would be a misnomer to call it an "award," though the arbitrator himself referred to it as that) was emphasized by a statement which soon followed the sentence quoted above, the essence of which was that Kurtin could still assert further rights under the settlement agreement: "Exercise of this right [to require Elieff to give security in his own interests in the Joint Entities] shall not, of itself, extinguish Kurtin's rights to payment under the Settlement Agreement, but shall only reduce the amount due under the Settlement Agreement by the fair market value of any Elief [*sic*] right, title or interest transferred to Kurtin."

The second paragraph of the award then bolstered the right of Kurtin to recover from *Elieff's own interests in* the Joint Entities by prohibiting Elieff from encumbering those interests until Kurtin was "paid in full." It also provided that Elieff would hold "in constructive trust for Kurtin anything he received from said Joint Entities from this date [June 11, 2007] forward."

The next two, one-sentence paragraphs, suggested that there was no winner in the arbitration: Paragraph one read: "No attorney fees or costs are awarded." Paragraph two read: "This award is not intended to preclude any other remedy that Kurtin may have at law, or in equity."

The final paragraph of the award referred back to the arbitration paragraph of the original agreement. It self-consciously recognized that arbitration decision was, in fact, amending the terms of the original settlement agreement: "This award shall also constitute an amendment to the Settlement Agreement of August 15, 2005, pursuant to

13

Paragraph 15 of that Agreement, and shall be enforceable under C.C.P. Section 664.6, as well as enforceable as an arbitration award."

### c. Discussion

Elieff argues the arbitration decision, as the result of a prior proceeding, necessarily precluded further litigation of his liability on the unpaid balance under the settlement agreement in this civil action as a matter of res judicata. As summarized by our Supreme Court in *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797, the doctrine of res judicata requires that the cause of action in the prior proceeding be the same as in the present cause of action, the prior proceeding result in a final judgment on the merits, and the parties be the same as in the prior proceeding. (Or in privity with parties in the prior proceeding). If applicable, the doctrine "not only precludes the relitigation of issues that were actually litigated, but also precludes the litigation of issues that could have been litigated in the prior proceeding." (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 557.)

Elieff emphasizes the "could have been" aspect of the res judicata doctrine. He argues that Kurtin asserted his "primary right" to be made whole in the arbitration proceeding, which is the same primary right he subsequently asserted in this civil case, and therefore must be satisfied with the decision the arbitrator handed down.

The flaw in Elieff's logic is that he confuses what Kurtin *asked for* in the arbitration with the arbitrator's power to *give it* in light of the scope of the arbitrator's powers to which the parties had agreed. It is well established that the scope of an arbitrator's powers are fixed by the agreement to arbitrate. (E.g., *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 8 [the """"powers of an arbitrator are limited and circumscribed by the agreement or stipulation of submission"""]; *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert* (2011) 194 Cal.App.4th 519, 528 ["An arbitrator's powers 'derive from, and are limited by, the agreement to arbitrate.'"].)

14

Here, the settlement agreement conferred only limited powers on the arbitrator.  There is no provision giving the arbitrator power to make an award against any party for money.  The arbitrator's powers are limited to interpreting the settlement agreement and, at the most, amending it to insert intended but inadvertently omitted material terms.

And the arbitrator did just that.  He interpreted and amended the agreement to insert terms which had been understood by the parties, but did not find their way into the final text.  Thus, to the degree that the agreement was initially ambiguous as to Kurtin's right to security involving *all* the assets of each Joint Entity, the arbitrator cleared up that ambiguity by limiting Kurtin's right to security to just *Elieff's interests in* each Joint Entity.

The "primary right," then, that was adjudicated in the arbitration was not Kurtin's "right to be made whole," but Kurtin's right, under the agreement, to have the mediator who midwifed the settlement agreement interpret, and if necessary amend, the agreement.  This case thus presents the opposite of the usual could-have-been-decided situation in res judicata analysis, where a litigant seeks to litigate in a second proceeding what could have been litigated in the first place.  Here, a litigant sought to litigate more in the first proceeding than he could have possibly obtained from  it.

Elieff's argument that *O'Malley v. Petroleum Maintenance Co.* (1957) 48 Cal.2d 107 (*O'Malley*), *University of San Francisco Faculty Assn. v. University of San Francisco* (1983) 142 Cal.App.3d 942, 954 (*University of San Francisco*), *Felner v. Meritplan Ins. Co.* (1970) 6 Cal.App.3d 540, 544 (*Felner*), and *Crofoot v. Blair Holdings Corp.* (1953) 119 Cal.App.2d 156, 186-187 (*Crofoot*) compel a contrary result is unpersuasive.  All these cases are distinguishable.

*O'Malley* and *University of San Francisco* both involved *second agreements* to specifically submit disputes to arbitrators which clearly encompassed the scope of what was later challenged in court.  (See *O'Malley, supra*, 48 Cal.2d at p. 108

15

[submission agreement made after initial collective bargaining agreement specifically included question of arbitrability by arbitrators] & p. 110 [holding employer bound by terms of its submission agreement]; *University of San Francisco, supra*, 142 Cal.App.3d at pp. 945, 953-954 [noting that "additional agreement" plus "discussion at the hearing" showed that supplemental pension provisions "were properly a subject of arbitration," plus "the parties stipulated" that the arbitrator had the power to decide issue of his own "jurisdiction'"].)

*Crofoot* involved an agreement to arbitrate after a "plethora" of litigation which, by its terms, included issues of law as well as fact. The court rejected, as a matter of textual interpretation of the agreement to arbitrate, one party's argument that the terms of the agreement "necessarily" excluded issues of law. (*Crofoot, supra*, 119 Cal.App.2d at pp. 164, 186.) Likewise, in *Felner*, the *text* of the agreement to arbitrate – there an uninsured motorist provision in an insurance policy – was held "broad enough" and "sufficiently comprehensive" to include a dispute over whether an uninsured motorist actually came into "physical contact" with the insured. (*Felner, supra*, 6 Cal.App.3d at pp. 543-544.)

In the case before us, unlike *O'Malley* and *University of San Francisco*, there was no second agreement specifically to arbitrate which encompassed the arbitrability of some issue which might have been outside some initial agreement. And unlike *Crofoot* and *Felner*, the actual text of this arbitration agreement – here, the settlement agreement *itself* – will not support the resolution by the arbitrator of the question of damages. We need only note additionally that while Kurtin may have sought more from the arbitrator than the arbitrator had the power to give, Elieff vigorously opposed Kurtin's attempt, and Elieff was successful in that opposition.

16

*2. The Mediation Privilege*

What we have just said about the nature of the settlement agreement bears on Elieff's main argument against the judgment, namely that Kurtin's invocation of the mediation privilege denied Elieff a fair trial. Elieff's argument goes like this: Various terms of the settlement agreement were ambiguous, particularly the clauses requiring Elieff to execute "customary" security documents. Typically, in contract litigation, extrinsic evidence is allowed so that the trier of fact may resolve the issue of what the parties intended when they used ambiguous terms in a contract. (E.g., *Duncan v. The McCaffrey Group, Inc.* (2011) 200 Cal.App.4th 346, 381, overruled on another point in *Riverisland Cold Storage v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1176, 1182 ["extrinsic evidence can be admitted to explain the ambiguity in the contract"].) But here, by asserting the "mediation privilege" (see Evid. Code, § 1119), Kurtin effectively prevented the trier of fact from hearing evidence from the mediation bearing on any ambiguities in the settlement agreement. Therefore, just as an attorney sued by a former client for malpractice must be allowed to use otherwise confidential information received from that client (cf. *McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378, 385), Kurtin's decision to hold firm to the mediation privilege means Elieff did not get a fair trial. Elieff should either have been allowed to present evidence otherwise precluded by the mediation privilege to defend himself or Kurtin should have been required to drop his claims. (See *Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451 [client's invocation of attorney-client privilege vis-à-vis attorneys sued for malpractice required dismissal of malpractice action against them].)

There are two flaws in the argument: One, Elieff already had a chance to clear up ambiguities in the settlement agreement before trial *in arbitration*. In fact, he actually used the arbitration process to clear up, in his favor, at least one ambiguity. (Here the parties acknowledge that the initial out-of-court proceeding was a mediation. The later proceeding which resulted in clarification of the settlement agreement is

17

referred to by the parties as an arbitration. Mediation and arbitration are two different things, as Evidence Code section 1119, subdivision (a) makes clear. What went on at the mediation was the subject of the mediation privilege. Further proceedings in arbitration would not be so privileged.)

Two, even if, arguendo, Elieff did not have a chance to clear up ambiguities by way of arbitration prior to going to civil trial, Kurtin still did not forfeit his right to sue Elieff by asserting the mediation privilege. The California Supreme Court has clearly signaled the policy behind the mediation privilege is so strong that California law is willing to countenance the "high price" of the loss of relevant evidence to protect the privilege. (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 138 (conc. opn. of Chin, J.).)

### a. Elieff's chance to clear up ambiguities before trial

The first flaw in Elieff's mediation privilege argument is that he ignores the opportunity he had to resolve ambiguities in the settlement agreement by returning to the original mediator in arbitration. Accordingly, Elieff cannot now be heard to complain that he was denied the chance to resolve ambiguities at trial. The arbitration paragraph gave each party the right to go to arbitration in front of the one person most familiar with what the parties achieved at their mediation – the mediator himself – where any ambiguity in its terms might be resolved.

As against such an opportunity, Elieff counters with the argument that the arbitration paragraph (giving the parties the right to return to the arbitrator) really is restricted to situations absolutely necessary to make the settlement agreement enforceable. Outside of those situations, he now argues, the arbitrator did not have the power to interpret ambiguous terms in the settlement agreement.

We cannot agree. The text of the arbitration clause is, on balance, most naturally read to set forth three sets of arbitral powers, with only the last of those three tethered to the idea of some need to avoid making the agreement unenforceable.

18

We begin by observing the arbitration clause (quoted in full on page 12, infra) consists of six sentences:  The first two make the points that the settlement agreement consists of all material terms, and the parties want the agreement to be enforceable, while the sixth sentence specifies the intent that the agreement indeed be enforceable as the settlement of pending litigation under Code of Civil Procedure section 664.6.

It is sentences three and five on which Elieff relies to confine the arbitrator's power to interpret or cure ambiguities only to situations where the cure was absolutely needed to preserve enforceability.  For reader convenience, we quote those two sentences again here, and include the intervening sentence four:

"[Sentence 3:]  In the event that any Party claims that one or more material terms have been omitted from this Settlement Agreement, or that the Parties failed to reach an agreement as to one or more material terms, or that any other defect exists with respect to this Settlement Agreement that would make it unenforceable, the Parties agree to final and binding arbitration before Tony Piazza or, if Mr. Piazza is unable, before a mutually agreeable arbitrator.  [Sentence 4:]  At such arbitration, the arbitrator shall imply a reasonable term that the arbitrator finds consistent with the purpose and intent of this Settlement Agreement or otherwise cure any defect in the Settlement Agreement by amending its terms.  [Sentence 5:]  The sole act of the arbitrator shall be to issue an amendment to this Settlement Agreement implying such additional terms, curing any ambiguity or otherwise curing any defect in this Settlement Agreement that would make this Settlement Agreement unenforceable."

Readers will see that sentences three and five are constructed in two parallel series of three clauses, each clause dealing with, in order:  (1) omission of material terms; (2) curing ambiguity or disagreement as to those material terms; and (3) unspecified defects.  In each sentence, only the last clause, concerning unspecified defects, is *unambiguously* connected to the idea of remedying unenforceability.  Thus, to

19

make the unenforceability language apply to either of the first two clauses, one must relate back to the first and second clauses the unenforceability language one finds in the third clause. And that of course is how Elieff reads sentences three and five in this appeal.

To be sure, Elieff's argument is consistent with the references to "other defect" in sentence three, and the reference to "otherwise" in sentence five. Those two references can indeed be stretched to suggest a connection between what happens in the third clause and what has gone before in clauses one and two.

All else being equal, however, courts prefer a more natural reading of text to a less natural one, whether that text be found in a statute (e.g., *Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 768; *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 672) or a contract (*Lapp-Gifford Co. v. Muscoy Water Co.* (1913) 166 Cal. 25, 27-28 [more natural interpretation of letter to creditor containing check for "final payment" was that it did not refer to payment in full of the disputed debt]; *Dover Village Assn. v. Jennison* (2010) 191 Cal.App.4th 123, 128-129 [more natural reading of CC&R's was that sewer pipes were not "'exclusive use'" items for purposes of repair responsibility].) And of course courts are directed by statute to read contracts as a whole, so, if reasonably practical, no part is deprived of effect. (Civ. Code, § 1641.)

In this case, we conclude Elieff's interpretation of the arbitration provision is not the more natural reading and does not give effect to the whole of the arbitration provision.

First, Elieff's reading is by no means *compelled*. Sentence three's phrase "other defect," and sentence five's use of the word "otherwise" do not *necessarily* require a connection to the first two clauses. Logically, each of the three clauses can be seen as independent of the others, i.e., the arbitrator has three sets of powers: (1) omission of material terms; (2) curing ambiguity or disagreement as to material terms; and (3) curing

20

any unspecified defects which might make the agreement not enforceable. The independence of the three clauses is confirmed when one realizes that, grammatically, in sentence three the third clause is not even necessary to make an intelligible English sentence. Sentence three is written so the first two clauses easily survive even if the third were completely omitted. (Thus: "In the event that any Party claims that one or more material terms have been omitted from this Settlement Agreement, or that the Parties failed to reach an agreement as to one or more material terms, the Parties agree to final and binding arbitration . . . .")

By the same token, sentence five, like sentence three, also can be read logically to set forth three independent clauses, though the gerund-based parallel construction ("implying . . . curing . . . or otherwise curing") makes it impossible to simply omit the third clause. Even so, the "or" separating the third clause from the other two emphasizes the independence of each clause: Either (1), (2) "or otherwise" (3). In that sequence, whatever is attached to (3) is not necessarily attached to (1) or (2).

Second, Elieff's reading of the arbitration clause tends to reduce sentence four to a meaningless afterthought. Sentence four begins by pegging off sentence three ("[a]t such arbitration") but articulates two powers of the arbitrator without any qualification as to enforceability. To be sure (as shown by sentences one, two and six), the parties clearly wanted their mediated agreement to be enforceable. But if they wanted to confine the arbitrator's powers *solely* to what was necessary to "save" that enforceability, there was no need to write sentence four. By stating powers in sentence four without any reference to enforceability, an intention is evidenced to give the arbitrator powers to construe the contract without a need to justify their use on a "saving" theory – an intention particularly demonstrated by the structure of the preceding sentence three, where the reference to enforceability (as shown above) is not even grammatically necessary.

21

Third, and most importantly, the last antecedent rule strongly indicates the arbitrator's powers are necessarily pinned down by a requirement to only be exercised to "save" the agreement. (See *ACS Systems, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 147 Cal.App.4th 137, 150 [applying last antecedent rule, which usually applies to statutes, to contracts as well].)

The last antecedent rule is the common sense presumption that the tail should not wag the dog in sentence construction, i.e., qualifiers apply to words and phrases *immediately* preceding them, as distinct from words and phrases more remote. (See *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743.) In this regard, we note that if the parties really meant to confine the arbitrator's power to interpret terms or cure ambiguities to *only* situations where it was absolutely necessary to make the agreement enforceable, they could easily been much clearer than appending that limitation to the last of three successive clauses. (Here's one possibility: "In order to make sure this agreement is absolutely enforceable, the arbitrator shall have the power to (1) insert omitted terms, (2) cure ambiguities, or (3) remedy defects, but the arbitrator's power to so shall be limited only to those situations where it is necessary to make sure the agreement is enforceable; otherwise the arbitrator shall have no power at all.")

Four, a reading of the arbitrator's powers not dependent on a need to "save" the agreement was one Elieff himself used with ease at both the trial and appellate level in other contexts when describing the arbitration clause. At the trial level, in the context of opposing Kurtin's attempt to obtain judgment under section 664.6 of the Code of Civil Procedure, Elieff's trial counsel observed: "The Settlement Agreement provided for final and binding arbitration in front of the person who mediated the settlement, Tony Piazza, if a party claimed that a material term had been omitted or that another defect with the agreement existed." The sentence lacks any qualifier about "only if necessary to save the agreement."

22

Likewise, at the appellate level, after Kurtin sought writ relief in this court because the trial court refused to grant the Code of Civil Procedure section 664.6 motion, Elieff's counsel quoted with approval Kurtin's counsel's characterization of the arbitration provision that "'if there's anything in this agreement that prevents the express intent of the parties from being carried out, the arbitrator can fix it basically.'" The context of that quotation, ironically, was *Elieff's* point that *Kurtin* already had a remedy to enforce the agreement in arbitration. And again, nothing was said about enforceability qua enforceability being a prerequisite for resort to the arbitrator.

And finally, in this regard, we also further note that at the arbitration that was actually held, Elieff won an important interpretational victory independent of any need to save the contract – a victory he certainly has not repudiated as beyond the arbitrator's powers. Namely, he established that Kurtin's claims under the agreement only extended to Elieff's own interests in the Joint Entities, as distinct from being directly against the Joint Entities themselves.

In sum, on balance, we conclude the better reading of the text of the arbitration clause is that Elieff could have cleared up any ambiguities he thought necessary to his defense by going back to the mediator prior to trial. Doing so, we note, would also have been consonant with the zealous regard the law affords the mediation privilege, which we now address.

b. *California's Zealously Guarded Mediation Privilege*

But even if the arbitration clause *is* limited to just clearing up what is minimally necessary to have an enforceable agreement, Elieff's more basic argument – that Kurtin *forfeited* his claims against Elieff by invoking the mediation privilege (see Evid. Code, §§ 1115-1128 and particularly § 1119) – cannot prevail. The mediation privilege carries with it different dynamics than simple attorney malpractice cases where a party can indeed be required to give up an evidentiary privilege as the price of asserting

23

its claim. (E.g., *Solin, supra,* 89 Cal.App.4th at p. 467; *McDermott, Will & Emery v. Superior Court, supra,* 83 Cal.App.4th at p. 385 [corporate outside counsel entitled to judgment in shareholder derivative action where counsel could not make use of attorney-client communications].) Elieff's theory concerning mediation simply cannot be squared with what our Supreme Court unanimously both did and said in *Cassel v. Superior Court, supra,* 51 Cal.4th 113.

In *Cassel*, a plaintiff in a legal malpractice action claimed his attorneys had, in a pretrial mediation, pressured, harassed and otherwise coerced him into accepting a lower price than he wanted for certain licensing rights. The Supreme Court upheld a trial court order precluding the admission of evidence related *to the mediation*, including the discussions the plaintiff had with his attorneys. (*Cassel, supra*, 51 Cal.4th at pp. 121, 138.) The high court acknowledged that the exclusions "may indeed hinder the client's ability to prove a legal malpractice claim against the lawyers." (*Id.* at p. 122) But, as Justice Chin separately wrote to explain why he was "reluctantly" concurring in the judgment, the high court was willing to pay such "a high price . . . to preserve total confidentiality in the mediation process." (*Id.* at p. 138 (conc. opn. of Chin, J.).)

The application of the mediation privilege in *Cassel* meant, under the particular circumstances of that case, the *plaintiff's* ability to present a claim was hindered. Here, Elieff argues that application of the mediation privilege supposedly hindered his ability *as defendant* to defend against a claim. And on that difference – the difference between one's status as a plaintiff or as a defendant – Elieff hangs all attempt to distinguish *Cassel*.

But we cannot see any meaningful difference between plaintiffs and defendants in the mediation privilege situation. In fact, differentiating between them makes no sense. One need only think of the consequence of Elieff's position to understand it was never intended by the Legislature. Under Elieff's theory, parties to a mediation would know that if they were successful in achieving a mediated settlement in

24

which they were the obligee, they could not enforce the settlement without running the risk of their adversaries claiming terms of the settlement were ambiguous, and forcing either (1) the disclosure of communications made in the course of the mediation or (2) the loss of the very benefit of that mediation, which was the mediated agreement itself. By contrast, obligors would have a natural advantage over obligees. They could put obligees to the Hobson's choice of giving up the benefit of the settlement or allowing the airing of privileged communications. The Legislature obviously never intended such asymmetry.

Due process is an underlying theme of Elieff's argument. Somehow, he says, it was fundamentally unfair that he was sued under a mediated agreement but was not allowed to bring evidence bearing on what the parties discussed concerning the actual terms of that agreement. But the *Cassel* decision itself confronted and rejected the idea that enforcing the mediation privilege statutes "in strict accordance with their plain terms" deprives a civil litigant of due process. (*Id*. at p. 124.) Said the court: "We further emphasize that application of the mediation confidentiality statutes to legal malpractice actions does not implicate due process concerns so fundamental that they might warrant an exception on constitutional grounds. Implicit in our decisions . . . is the premise *that the mere loss of evidence pertinent to the prosecution of a lawsuit for civil damages does not implicate such a fundamental interest*." (*Cassel, supra*, 51 Cal.4th at p. 135, italics added.)

Moreover, and significantly, a page after the "mere loss of evidence" statement, the *Cassel* opinion again rejected the notion that somehow due process was implicated by protection of the privilege, but phrased its idea in such a way as to apply to *both* sides of a dispute: "The Legislature decided that the encouragement of mediation to resolve disputes requires broad protection for the confidentiality of communications exchanged in relation to that process, *even where this protection may sometimes result in the unavailability of valuable civil evidence*." (*Cassel, supra*, 51 Cal.4th at p. 136, italics added.)

25

This court followed *Cassel* in its recent decision in *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289 (*Provost*), where we rejected the claim of a party seeking to disavow a stipulated settlement arrived at through mediation, even though the party claimed coercion from threats of criminal prosecution by the other party if he did not enter into the agreement. (See *id*. at pp. 1302-1304.) If evidence of *coercion* in the achievement of a mediated agreement itself was properly excluded by the mediation privilege in *Provost*, how much less compelling is Elieff's contention that Kurtin should forfeit his claim to repayment where the assertion of the privilege entails only an *incidental* loss of evidence from a mediation bearing on allegedly ambiguous contract terms.

Elieff places great reliance on *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56 (*Kieturakis*) for his forfeiture theory, but the case doesn't help him.

*Kieturakis* is a somewhat complicated case that arose from a mediated divorce settlement which lopsidedly favored the husband, so we must explore it in some detail to show why does not stand for what Elieff claims. In fact, *Kieturakis* is a case which strongly upholds the mediation privilege.

After the mediated divorce settlement in *Kieturakis* the wife attempted to set it aside. Under substantive family law, the question then arose as to whether the husband had exerted undue influence in obtaining the settlement agreement, and, again as a matter of substantive family law, on that issue the husband bore the burden of showing he *did not* exert undue influence. To ascertain whether the husband had indeed exerted undue influence, the trial court *allowed* in evidence from the mediation in the interests of "'justice'" (*Kieturakis, supra*, 138 Cal.App.4th at p. 75) – something which, we now note, would clearly not be correct under *Cassel* or *Provost*. But, having made that mistake, the trial court concluded the husband had carried his burden of showing an absence of undue influence, so the trial court did not set aside the agreement. In effect,

26

the trial court's finding the husband had indeed carried his burden rendered harmless the earlier error of admitting evidence from the mediation.

Accordingly, the appellate court affirmed the order refusing to set aside the agreement. However, in affirming, it took the opportunity to explain that because the settlement was the product of mediation, the trial court had still erred in determining the husband bore the burden of proof. (*Kieturakis, supra*, 138 Cal.App.4th at p. 85.) To apply a presumption of undue influence from a lopsided agreement arising out of mediation would undermine the Legislature's preference for mediation. (*Id*. at pp. 85-87.)

It was in the process of recognizing that there was indeed a cost to be paid for the *Legislature's* value judgment placing a higher value on mediation than on the substantive family statutes involving possible undue influence, that the *Kieturakis* court made a comment which Elieff now asserts requires dismissal of Kurtin's claims. "However, if there is a price to be paid in fairness to preserve mediation confidentiality, the cases have required that it be paid by parties challenging, not defending, what transpired in the mediation." (*Kieturakis, supra*, 138 Cal.App.4th at p. 87.)

We are not persuaded by Elieff's argument connecting (a) the observation made by the *Kieturakis* court and (b) the idea Kurtin was put to a forced choice of giving up the mediation privilege or dropping his claims. Elieff's argument is a non sequitur. It does not follow from (a) *Kieturakis'* proposition that a party to a mediated agreement who later wants to *get out from under the terms of that agreement* cannot use evidence from the mediation to achieve her purpose if the other party asserts the mediation privilege to Elieff's proposition that (b) a *party seeking to enforce a mediated agreement* cannot do so without simultaneously losing the right to assert the mediation privilege.

*Kieturakis'* observation was, *in context*, a simple recognition that a party, such as the wife in the case before it, who seeks to *set aside* an agreement resulting from a mediation, will have a "price" to pay in being unable to use what happened at the

27

mediation to challenge the agreement. And under *Cassel*, that recognition is fairly unremarkable. Indeed, as applied to the case before us, the observation only strengthens our conclusion that the mediation privilege statutes mean that it was *Elieff*, not Kurtin, who was required to pay the "price" of the Legislature's policy in favor of mediation confidentiality. The whole point of the passage in *Kieturakis* was that the mediation statutes reflect such a strong legislative policy that it even allows "unfair agreements to stand." (*Kieturakis, supra*, 138 Cal.App.4th at p. 87.) As with *Provost*, if the Legislature is willing to allow even unfair mediated agreements to stand as a result of mediation confidentiality, it certainly is willing to stomach whatever incidental unfairness might result from a party's inability to use mediation evidence to explain allegedly ambiguous terms within a mediated agreement.

In sum, Kurtin did not lose this case by asserting a mediation privilege which the Legislature has chosen to zealously protect.


*3. The "Accounting" and Damages*

Elieff argues that cause of action number 7 (for violation of the "distribution" clause in paragraph 14) is precluded from any retrial because the "accounting" which Kurtin received established that Elieff took no "profits" and spent funds only for authorized purposes. As Elieff's trial attorney said after the trial judge delivered her decision in the phase 1 trial from the bench, "I want to address the issue of whether there's anything left to submit to a jury on the seventh cause of action."

The argument overstates what happened in the trial court. There was indeed much left after the phase 1 trial. The trial judge did not rule that Elieff took no "distributions." She ruled, rather, that money which was used by Elieff to maximize the "good of the whole" would not be covered by the distribution clause.

Only one of the five destinations of the outflows identified by the trial court, payments to Kurtin, is unequivocally not a "distribution" taken by Elieff to

28

"prevent" repayment of the unpaid balance. (That distribution was the $1.8 million that was itself a payment to Kurtin.) A reasonable jury might readily conclude that outflows within the other four categories (management services, management expenses, management costs, return of capital) both (a) did not benefit the Joint Entities as a whole and (b) prevented repayment of the unpaid balance. And the ultimate categorization of the various outflows was left to the jury. The trial judge granted a new trial on damages because the numbers of available outflows did not add up to the $24.4 million which the jury awarded on the seventh cause of action.

Put another way, the "gist" or "essence" of Kurtin's seventh cause of action was *not* one in equity. (Cf. *De Guere v. Universal City Studios* (1997) 56 Cal.App.4th 482, 507-508 [explaining when parties are, or are not, entitled to jury trial in context of contract actions involving accountings].) Tracing the various outflows from discrete Joint Entities was only ancillary to the true gravamen of that cause of action, focused as it was on whether various outflows came within the category of distributions that prevented repayment. A reasonable jury might very well find that much mischief might be done under the cover of management services, expenses, and costs. Even capital that was "returned" to Elieff might, if not otherwise linked to the "good of the whole," and if that return had the effect of preventing repayment, constitute an improper "distribution" under the distribution clause. With the exception of the "good of the whole" qualifier appended to the definition of distribution by the trial judge, the whole tenor of the settlement agreement was that Kurtin would be paid off the top from any money available for outflows from any of the Joint Entities, even if it meant that Elieff might go out of pocket.

By the same token, we must reject Elieff's argument that Kurtin did not prove any damages. While a requirement of actual collectability from the Joint Entities puts a limit on Elieff's liability under section 2342 and under section 2343 per section 3318 (see discussion below in part 5 of this opinion), Kurtin had no need to establish

29

collectability under his cause of action for violation of either the "distribution," or security-document clauses of paragraph 14. And phase 1 showed that of $22.4 million in outflows from Joint Entities identified in the phase 1 trial, only $1.8 million was shown to have been paid to Kurtin. That leaves about $20 million in distributions for which Elieff might (at least in theory) be personally liable under the distribution and security clauses of the settlement agreement alone.

*4. Inconsistent Verdicts Regarding Section 2343*

Kurtin's cause of action number 3 for violation of section 2343 presents the problem of inconsistent jury verdicts. The text of section 2343 plainly requires either the absence of a good faith belief on the part of the agent that he or she "has authority" to enter into the contract on behalf of a principal, or acts "wrongful in their nature." Here is the text of section 2343: "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] 1. When, with his consent, credit is given to him personally in a transaction; [¶] 2. When he enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so; or, [¶] 3. When his acts are wrongful in their nature."

The problem is the jury found that that Elieff *did* have a good faith belief he could obligate the Joint Entities, and the only "wrongful" acts which the jury were asked to impute to Elieff were negligent or intentional misrepresentation, and the jury refused to find he engaged in either of those wrongful acts. Compounding the problem was Kurtin's own argument to the jury at the end of trial. That argument specifically linked Kurtin's claim of wrongful acts to the intentional misrepresentation claim. Kurtin's counsel rhetorically asked the jury, "Did Bruce Elieff commit an act that was wrongful in its nature when he signed the settlement agreement on behalf of any of" the Joint Entities, then answered his own question by referring to his intentional misrepresentation cause of

30

action, emphasizing that Elieff had committed fraud: "Now, I'm going to defer on this question because in a minute we're going to come to a verdict form on what's called intentional misrepresentation."

Kurtin posits that any "wrongful" act that might be derived from the facts generally before the jury will satisfy section 2343, regardless of whether the jury specifically found that Elieff actually committed it. In particular, Kurtin suggests that a "wrongful" act can be extracted from facts showing breach of a partnership duty. The argument, however, rests on an incorrect interpretation of section 2343.

Case law explicating section 2343 shows that the "acts are wrongful in their nature" clause arises in juxtaposition to the normal rule that agents are not liable for the torts or breaches of contract of their principals. (See *Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 Cal.App.4th 249, 255 [independent insurance adjuster retained by insurer to adjust loss not directly liable in tort for negligent claims handling].) The "wrongful in their nature" clause codifies a corollary rule that agents *are* responsible for their *own* independent torts and breaches of contract in connection with "acts in the course of their agency." (See *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68-85 (*Shafer*) [attorney of insurance company providing coverage for defendant liable for own fraud in misrepresenting defendant's coverage to third party claimants]; *Bayuk v. Edson* (1965) 236 Cal.App.2d 309, 319-320 (*Bayuk*) [rejecting agent's argument he could not be liable on theory "he was acting for a disclosed principal," because he "personally agreed" to supervise construction of house and was negligent in doing so].)

Here, however, the jury never determined that Elieff committed any wrongful act in the *course* of signing on behalf of the Joint Entities. To be sure, he breached his own personal obligations not to take distributions which prevented repayment and to provide documents to secure his own interests in the Joint Entities, but those were not "acts in the course" of an assumed agency. The jury specifically found, in

31

regard to his signing, that he had a good faith belief in his authority, and made no misrepresentation, intentional or negligent. Because of these inconsistent verdicts, we cannot say that the jury impliedly found a tort or a breach of contract "in the course" of an agency where they had not been asked to find one.

The trial court itself rejected Elieff's motion for a new trial as to liability under section 2343 by concluding that the evidence showed wrongful conduct in the lack of an intention to ever "expose" the Joint Entities to liability and by "act[ing] to impair" their ability to perform. The problem with the former rationale is that the jury rejected all findings of fraud or misrepresentation on Elieff's part. The problem with the latter rationale is that Elieff's obligation under the distribution clause not to impair the Joint Entities' ability to perform was a personal obligation (liability for which remains undisturbed by our decision today), not an act "in the course" of his assumed agency.

The law is clear that the proper remedy for inconsistent verdicts is "not to grant judgment as a matter of law in favor of one of the parties, but rather, to order a new trial." (*Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 376; *Shaw, supra*, 83 Cal.App.4th at p. 1344; e.g., *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 704 ["Because the jury rendered inconsistent verdicts, we will reverse and remand for a new trial."].) We have power to modify the new trial order on appeal to have it include a new trial on the issue of liability under section 2343 as well as damages (Code Civ. Proc., § 906), and do so now.

5. *Kurtin's Cross-Appeal*

   a. *The Relationship Between Section 2343 and Section 3318*

      i. *no effect on new trial order*

The trial court's formal order on motion for new trial agreed with Elieff's contention that the measure of damages for the violation of section 2343 is found in section 3318. In particular, the trial judge cited the language from section 3318 that the

measure of damages is what "could have been recovered and collected from [the agent's] principal if the warranty had been complied with" as governing in the new trial to come. Accordingly, the judge ruled that "even as" to the cause of action for violation of section 2343, "Kurtin [would be] required to prove actual damages." The judge "left for another day" the question of how "'recovered and collected'" should be interpreted and "what degree of certainty" would meet "that standard."

In his cross-appeal, Kurtin now argues that the trial judge's ruling that section 3318 governs his section 2343 claim was incorrect. His main concern is the "recovered and collected" clause of the statute. Given that the total value of the Joint Entities is apparently not enough to pay off the unpaid balance of the $48.4 million buyout price (much less Elieff's personal *interests in* those entities), Kurtin argues that section 3318 does not establish the relevant measure of damages. Kurtin argues for an interpretation of section 2343 that would make Elieff personally liable for the unpaid balance exceeding more than $20 million without regard to section 3318's "recovered and collected" language.

Preliminarily, we reject Kurtin's argument that any error by the trial court on the issue of the applicability of section 3318 to section 2343 requires reversal of the order granting a new trial. As we have just shown in the preceding part of this opinion, given the inconsistent jury verdicts in this case, even the question of Elieff's liability under section 2343 must be considered anew by the trier of fact. Moreover, the trial judge identified several other reasons to order a new trial besides the inconsistent verdicts. These included: the failure of the amount of damages assessed to add up to the distributions at issue, the fact that the jury's award "exceeded even Kurtin's argued for" damages of about $7.8 million, and the lack of more detailed evidence in phase 2 of the trial by which the jury might be able to evaluate the "two dozen cash transactions" which the trial court itself had considered in phase 1. Even if, for sake of argument, the trial judge's announced opinion on the applicability of section 3318 to section 2343 were

33

incorrect, under an abuse of discretion standard we can hardly say that the trial judge was unreasonable in determining to re-try the whole issue of damages.

However, because the question of the proper measure of damages under section 2343 has been fully briefed on appeal and the new trial order is being affirmed, we address the question of the applicability of section 3318 to section 2343 for the benefit of the trial court on remand. (Code Civ. Proc., § 43.) The question is a matter of first impression in California.

As we now show, the trial judge was correct. Section 3318 does indeed limit the damages recoverable under section 2343.


*ii. text of sections 2342, 2343 and 3318*

For reader convenience we now set out the complete verbatim text of the three statutes at issue, including repeating the text of section 3318 recited in the previous part of this opinion.

Section 2342 provides: "One who assumes to act as an agent thereby warrants, to all who deal with him in that capacity, that he has the authority which he assumes."

Section 2343 provides: "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] 1. When, with his consent, credit is given to him personally in a transaction; [¶] 2. When he enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so; or, [¶] 3. When his acts are wrongful in their nature."

Section 3318 provides: "The detriment caused by the breach of a warranty of an agent's authority, is deemed to be the amount which could have been recovered and collected from his principal if the warranty had been complied with, and the reasonable

34

expses of legal proceedings taken, in good faith, to enforce the act of the agent against his principal."

### iii. analysis of text

The opening line of section 3318 sets forth a clear measure of damages for breach of an agent's warranty of authority, and makes no differentiation as to whether that breach is in good faith (section 2342) or lacks good faith (section 2343, subdivision (2)). Damages against the agent are limited by what could be "recovered and collected" from the agent's purported principal.

Any argument that section 3318 does not apply to section 2343 necessarily rests on two premises: (1) section 2343 contains its own, competing, measure of damages in the form of section 2343's "responsible . . . as a principal clause" and (2) the competing measure of damages clause set forth in section 2343 must prevail over the alternative in section 3318. That is, for section 3318 to *not* apply to section 2343, the "responsible . . . as a principal" clause of section 2343 must necessarily trump the "detriment . . . is deemed to be" clause of section 3318.

Courts, of course, must prefer statutory interpretations which harmonize and reconcile potentially conflicting statutory meanings. (E.g., *Voices of the Wetlands v. State Water Resources* (2011) 52 Cal.4th 499, 519; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778-779.) In the present case, the two potentially competing clauses ("responsible . . . as a principal" and "detriment . . . is deemed to be") may be harmonized by reading section 2343's "responsible . . . as a principal" language to set forth the *fact* of liability (i.e., if a purported agent does X, Y, or Z, he or she shall be liable as a principal) while section 3318 sets forth the precise *amount* of liability (i.e., if there is liability for doing Y, then here is the way the detriment is calculated). Three reasons impel our conclusion.

35

First, the very structure of the Civil Code suggests that very harmonization. Chapter and section headings may be considered in ascertaining legislative intent and are entitled to "considerable weight." (*People v. Hull* (1991) 1 Cal.4th 266, 272; *Howard Jarvis Taxpayers Association v. County of Orange* (2003) 110 Cal.App.4th 1375, 1385.) Sections 2342 and 2343 are contained within article 4 (obligations between principals and third persons) which is a subdivision of title 9 (dealing generally with agency) which is within part 4 (obligations arising from particular transactions) of division 3 (generally dealing with obligations) of the Civil Code. On the other hand, the general subject of relief, including damages, is within part 1 of division 4 (general provisions). Section 3318 is found in article 1 (damages for breach of contract), which is within chapter 2 (measure of damages) which is within title 2 (compensatory relief), which is within division 4 (dealing with general provisions). One can, from this pattern, divine the general structure of the Civil Code on the subject of breaches of an agent's warranty of authority: Spell out the obligation in division 3. Set forth the remedy in division 4.

Second, textually, we are required to give effect to section 2343's "in the course of his agency" clause" as well as its "responsible . . . as a principal" clause. When the statutory clauses are read together ("responsible . . . as a principal in the course of his agency") it is evident that the statute was intended to refer to the *particular* transaction in which the agent "assumed" to act for another. The statute was not intended to assign a liability to the purported agent beyond what was inherent in that particular transaction, i.e., beyond the course of his agency. We note that Kurtin's proposed interpretation of section 2343 not only ignores the plain language of section 3318, but confers on Kurtin a windfall beyond the course of Elieff's purported agency, i.e., beyond the original expectations of the parties.

The point may be illustrated by examining the original intentions of the parties as the transaction was supposed to occur. Assume, for sake of argument, that Elieff really *did* have authority to bind the Joint Entities, that Elieff delivered all the

36

security documents he was required to deliver, and that he took no distributions of any kind (e.g., forewent management fees otherwise legitimately owed to his companies) from any of the Joint Entities. But further assume (as appears indeed to have occurred in this case) that *despite* Elieff's foregoing any distributions from the Joint Entities, the real estate recession put them all into insolvency. In such a case, there would be no question that Kurtin would be limited to what he could "recover and collect" from any of the Joint Entities, even if he had to go to bankruptcy court for that recovery. Section 3318 sets forth a measure of damages that indeed reflects the benefit of the bargain, *together with the commercial risks inherent in that bargain*, which Kurtin actually made.

The third reason is that to the degree that section 2343's "responsible . . . as a principal" clause does indeed conflict with section 3318's "detriment is deemed to be" clause, section 3318 must prevail as the more specific. (See Code Civ. Proc. § 1859 ["a particular intent will control over a general one that is inconsistent with it"]; e.g., *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577 ["'It is well settled . . . that a general provision is controlled by one that is special, the latter being treated as an exception to the former.'"].) The precise "responsibility" or liability of a principal in any given context may vary, depending on the circumstances. For example, in criminal law, aiders and abettors are "liable as a principal" for the crime, but the exact extent of their liability is fixed by more specific penalty statutes. Here, section 3318 fixes a clear measure of damages for breaches of an agent's warranty of authority. By contrast one can puzzle all day over the degree to which "responsible . . . as a principal" implies a measure of damages, if it does at all.

To the degree that case law has addressed the question of whether section 3318 applies to section 2343, the answer is yes. (See *Borton v. Barnes* (1920) 48 Cal.App. 589 (*Borton*).) *Borton*, in fact, contains a plain statement that section 3318 provides the measure of damages in a section 2343 situation where the agent lacks a good faith belief in his authority. (*Borton, supra*, 48 Cal.App. at pp. 591-592; cf. *Nichols*

*Grain & Milling Co. v. Jersey Farm Dairy Co.* (1933) 134 Cal.App. 126, 130 [following *Borton* but not mentioning section 3318].)  The brief reference to section 2343 in *Jeppi v. Brockman Holding Co.* (1949) 34 Cal.2d 11, 18-19 [observing that difference between section 2342 and section 2343 is that under section 2342 the agent is simply "held to account on a theory of breach of the implied warranty of authority" while under section 2343 the agent is held liable "as a principal"] merely notes the general difference between section 2342 and section 2343.

The question of section 2342 remains.  There is a clear overlap between section 2342 [all breaches of an agent's warranty of authority] and section 2343, subdivision (2) [lack-of-good-faith breaches of an agent's warranty of authority].  We may observe that *all* liability for lack-of-good-faith breach of a purported agent's warranty of authority under section 2343 necessarily includes a breach of the purported agent's warranty of authority under section 2342 as well.  (See *Borton, supra*, 48 Cal.App. at p. 591 [treating section 2342 and section 2343 together].)

From this overlap, the question arises as to what the practical difference between section 2342 and section 2343, subdivision (2) might be.  One might postulate, simply to avoid a construction that avoids surplusage, that section 2342 and section 2343, subdivision (2) must have two different measures of damages, not just one as the language of section 3318 would lead one to believe, and, further, that the "as a principal" clause in section 2343 provides that different measure.

It does not, however, follow that section 2342 and section 2343 must have different measures of damages.  Much of the time, in fact, the result under either statute will be exactly the same, as shown in the two cases that remain the leading case authorities on the interaction between the two statutes and section 3318, namely, *Borton, supra*, 48 Cal.App. 589, and *Kohlberg v. Havens* (1919) 41 Cal.App. 222 (*Kohlberg*). *Kohlberg* was the first case to find liability under section 2342.  *Borton* was the first case to find liability under section 2343.  In each case, the plaintiff received from the

38

purported agent the commission he would have received from the purported principal if the purported principal had been liable on the contract. (In *Kolhberg*, the amount owing under the contract was not called a commission, but that's what it plainly was – the price of obtaining a third party's signature to a real estate agreement, see *Kohlberg, supra*, 41 Cal.App. at pp. 223-224.)

At the very least, the "as a principal" clause in section 2343 makes a potential difference as to when the applicable statute of limitations may begin to run. (E.g., *Kennedy v. Stonehouse* (1904) 13 N.D. 232 [where purported agent sued for lack-of-good faith breach of warranty of authority, statute of limitations began running when principal repudiated contract made in her name and not when agent initially misrepresented authority, which was ten years earlier].) Moreover, we may observe that the two statutes will yield different measures of damages in cases where the purported agent's breach of his or her implied warranty of authority comes under one of the two other subdivisions of section 2343, namely receiving credit personally, or is combined with his or her own independent tort.


### B. *The Accounting*

Kurtin presents another point in his cross-appeal that centers on the phase 1 trial. Like Elieff in the main appeal, Kurtin claims that phase 1 decided more than it did. Specifically, he identifies three issues he now says "should have been tried to the jury": (1) the meaning of "distribution" in paragraph 14; (2) the standard by which Elieff's decisions to move any funds from one Joint Entity to another should be judged; and (3) the question of whether there were payments from Joint Entities to Elieff distributions preventing repayment.

We perceive that Kurtin's cross-appeal as it relates to these questions is essentially protective, because he has not been aggrieved by the new trial order on any of these issues. Those issues *were* tried to the jury by way of Kurtin's seventh cause of

39

action for breaching the provision of the settlement agreement not to take distributions which prevented the Joint Entities from paying the balance of the buyout amount. And he prevailed on them. We need only mention here that we do not disturb the new trial order as to Elieff's liability on Kurtin's seventh cause of action on the distribution issue.

## DISPOSITION

The new trial order is modified to include a new trial on Elieff's liability under section 2343, as well as a new trial on the topic of damages. As modified, the new trial order is affirmed. In all respects the judgment and order denying JNOV are affirmed, but let us now spell out what exactly that means:

(1) We affirm the trial court's determination that Elieff is liable to Kurtin in an as-yet-to-be-determined amount, if any, on Kurtin's causes of action for (a) breach of warranty of an agent's authority under section 2342; (b) breach of the provision of the settlement agreement that Elieff would execute the documents necessary to perfect Kurtin's security interests in Elieff's share of the Joint Entities; and (c) for breach of the provision of the settlement agreement not to take distributions which prevented the Joint Entities from paying the balance of the buyout amount.

(2) As we modify the trial court's new trial order, the issue of both Kurtin's liability under section 2343 and, *if* he is found to be liable, the amount of damages for which he will be liable, will be the subject of the new trial.

(3) Moreover, in the new trial on section 2343, if Elieff is found liable, the amount of damages for which he will be liable will be governed by section 3318's "collected and recovered" language.

40

Because each side has prevailed on at least one point, each side will bear its own costs in this appeal.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.